UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| LENNOTH GREENWOOD, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 2:02CV00047 ERW |
| | ) |
| RURAL COMMUNITY INSURANCE SERVICES, et. al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter comes before the Court upon Defendant's Motion for Summary Judgment [doc. #87].

**I.      FACTUAL BACKGROUND[1]**

---

[1]The Court's recitation of facts is taken largely from the parties' statements of uncontroverted material facts. Pursuant to Local Rule 7-4.01(A), a party moving for summary judgment must file a memorandum in support of the motion, which includes citations to any authorities on which the party relies. Further, pursuant to Local Rule 7-4.01(E), this memorandum must "have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations." Each memorandum in opposition "shall include a statement of material facts as to which the party contends a genuine issue exists." The matters set forth in the moving party's statement of uncontroverted facts are deemed admitted for purposes of the summary judgment motion unless they are specifically controverted by the opposing party. Plaintiffs failed to specifically controvert many of the facts recited by Defendants, and those facts will be deemed admitted for the purposes of this Order. In this Court's discretion, those facts specifically controverted, even those responses to multiple paragraphs that were clustered into one paragraph, will be considered by the Court; however, the Court reminds the parties that in all future filings before this Court, controverted facts should be separated into to individually numbered paragraphs that refer back to the numbering scheme in the original statement of uncontroverted facts. Moreover, each paragraph should include citations to specific page(s) in the record where the evidence can be found.

In Defendants' Reply, they claim that Plaintiffs' controverted facts contradict previous deposition testimony. However, Defendants do not point to any specific facts supplied by Plaintiffs that contradict their deposition testimony. Thus, the Court will not "disregard" Plaintiffs' evidence. Similarly, Defendants generally argue that Plaintiffs cited their pleadings as evidence. The Court finds

1

Lennoth Greenwood and his family farmed several different tracts in north central Missouri. They grew soybeans and corn. The tracts included the Norton farm, Flowers farm and McAtee farm. During their ten years of farming, their tax returns establish that they never made an operating profit in their farming operations.[2] In 1999, Plaintiff purchased a(n alternative)[3] federally reinsured Multiple Peril Crop Insurance ("MPCI") policy issued by Defendant Rural Community Insurance Services ("RCIS"). The policy was purchased from Sharon Burgher, who was working on behalf of Missouri Crop Management ("MCM").[4] Initially, Plaintiffs only had one farm unit. As a new producer, the unit's Actual Production History ("APH") was established at 100% of the transitional yield for Macon County, Missouri.[5] In 2000, Plaintiffs rented the Norton farm, and it was added as a new farm

---

that Plaintiffs' references to the Second Amended Complaint were largely for the purpose of clarifying their claims. Plaintiffs filed thirty-one exhibits in support of their Response, and clearly do not rely solely on their pleadings in support of their argument that disputed issues of fact exist.

[2]Although the tax returns showed operating losses, Plaintiffs claim that the farming operation expected a yearly profit of $100 per acre for each of the 1561 acres of land being farmed. Plaintiffs further claim that their tax losses offset the earned income of Mr. Greenwood and resulted in a refund of withheld taxes.

[3]This Court notes that the provisions in Plaintiffs' Crop Revenue Coverage policy slightly differ from a MPCI policy's approved, standard policy provisions. However, those differences do not appear to be material or relevant to the parties factual disputes relating to Defendants' Motion for Summary Judgment. Thus, for simplicity, the Court will refer to Plaintiff's insurance as MPCI.

[4]The Court notes that the parties dispute whether MCM is an independent insurance brokerage corporation. Defendants argue that MCM and its agents were not obligated to sell policies exclusively for RCIS and could sell policies for any duly-authorized crop-insurance company. Plaintiffs point out that Defendants claim is inconsistent with Burgher's RCIS agent agreement which provides that an agent has a fiduciary duty to act in the exclusive interest of RCIS. Furthermore, Plaintiffs also note that Burgher and all the other agents at MCM sold only RCIS policies from 1999-2001.

[5]"New producers may have their approved APH yields based on unadjusted T or D-Yields or a combination of actual and unadjusted T or D-Yields." 7 CFR § 400.55(b)(6). A determined yield, or D-yield, is "[a]n estimated year for certain crops, which can be determined by multiplying an average yield for the crop (attained by using data available from The National Agricultural Statistics Service (NASS) or comparable sources) by a percentage established by the FCIC for each county." 7 CFR § 400.52(k). A transitional yield, or T-Yield, is "[a]n estimated yield, for certain crops, generally

unit to his policy. The amount of the insurance, and thus the premium, depended on the expected crop yield from each farm unit. Once issued, federally reinsured crop insurance policies are continuous and remain in effect until cancelled. 7 C.F.R. § 457.7.

The Federal Crop Insurance Corporation ("FCIC"), a governmental corporation and an agency of the United States Department of Agriculture administered by the Risk Management Agency ("RMA"), was formed when Congress passed the Federal Crop Insurance Act ("FCIA"), 7 U.S.C. § 1501, et seq. Federal crop insurance is presently sold by independent insurance brokerage companies, such as RCIS, under a Standard Reinsurance Agreement ("SRA") with the FCIC. 7 C.F.R. §§ 457.2(b), 400.161-400.176. The FCIC provides uniform policy provisions, sets premium rates, and determines the eligibility of farming practices and types and varieties of crops insurable by the state and county. *See generally* 7 U.S.C. § 1508; 7 C.F.R. §§ 400.168, 457.2, 457.3. The SRA incorporates the FCIA and FCIC regulations by reference, reinsuring approved policies sold by private insurance companies if the approved forms and loss adjustment procedures are used by the private companies. 7 C.F.R. §§ 400.164, 400.168(c), 400.208, 457.8. In return, the FCIC obligates itself to pay a predetermined portion of the policy premium as set out in the FCIA. 7 U.S.C. § 1508(h)(5)(A); 7 C.F.R. § 400.166(b). Moreover, any claims made on these policies are paid with United States Treasury funds. 7 C.F.R. Part 400, Subpart L. MPCI indemnities are calculated by (1) determining a guarantee, which is a multiple of the approved yield, based on a farm's actual production history, a county transitional yield established by the FCIC, or an average of both and the insured's coverage and the number of acres contained in the farm unit (*See* 7 C.F.R. § 400.55); (2)

---

determined by multiplying the ASCS program yield by a percentage determined by the FCIC for each county and provided on the actuarial table to be used in the APH yield calculation process when less than four consecutive crop years of actual or assigned yields are available." 7 CFR § 400.52(p).

3

subtracting from the guarantee the "production to count," which includes actual harvested production, production lost as a result of uninsured causes and unharvested production (*See* Common Crop Insurance Policy, 10); and (3) multiplying that difference by the unit price provided by the MPCI policy.

"The insurance provider is responsible for all loss adjustment responsibilities outlined in this handbook whether the requirement is performed by an adjuster or insurance provider employee." 1998 FCIC Directive 25010 Part 1 ¶ 7(A). "Some information must be verified by the adjuster at the time of the on-the-farm visit." 1998 FCIC Directive 25010 Part 2 § 2 ¶ 18. One such requirement is that the adjuster "[p]erform APH Field Reviews when insureds are affiliated with Crop Insurance." 1998 FCIC Directive 25010 Part 2 § 2 ¶ 22(1). FCIC procedure requires that those persons performing the loss adjustments are responsible for reviewing the unit structure and APH prior to or during the claim inspections. See 7 C.F.R. § 400.168(d); *See* FCIC Directive 18010 §§ 5, 9, 10, 14. Loss adjustments were performed on Plaintiffs' insured units in both 1999 and 2000. These loss adjustments were used in calculating Plaintiffs' actual production history ("APH") for those years. RCIS's loss adjusters did not challenge the unit structure or actual production histories for Plaintiffs' 1999 and 2000 claims.

In 2001, Plaintiffs made a claim based on their MPCI policy for crop losses. RCIS denied the claim, asserting that a portion of the claim could not be substantiated by written verifiable records. On April 17, 2002, Plaintiffs filed this lawsuit alleging that Sharon Burgher, the agent who sold the Greenwoods the policy, spoke with Mr. Greenwood about crop insurance options and allegedly misrepresented to him the amount of insurance that was available. The parties seem to disagree about what Plaintiffs are claiming to be their damages. Plaintiffs allege that they have endured consequential

4

damages stemming from the delay in RCIS's processing of their claim.[6] Defendants interpret Plaintiffs alleged damages to be the difference between the arbitrator's award and Mr. Greenwood's own indemnity calculation based on his belief of what amount should have been paid under the policy's coverage provisions.

## II. PROCEDURAL BACKGROUND

On April 17, 2002, Greenwood filed a five count complaint against RCIS, MCM and two employees of MCM, Sharen Burgher and Jim Collins. While the dispute continued, Plaintiff declared bankruptcy. The Bankruptcy Court transferred the case to the Northern District on June 24, 2002. A summary of the counts included: (1) a breach of contract claim against RCIS; (2) a breach of contract claim against MCM (as principal in employer/employee relationship); (3) misrepresentation (made by Sharen Burgher); (4) interference with business operations (by Jim Collins); and (5) a claim for punitive damages (treble damages).

On November 15, 2002 this Court granted Defendants' Motion to Compel Arbitration and Stay the District Court proceedings. Former Missouri Supreme Court Justice, Albert Rendlen, was mutually selected to act as arbitrator for the parties. The arbitration was held on October 14, October 15, October 16, and November 10, 2003. Judge Rendlen found there was a breach of contract. Defendants claim that the arbitration award was based on the alleged misrepresentation being true,

---

[6]Plaintiffs are claiming economic damages and damages "related to the loss of their farm and lifestyle, the requirement that retirement funds be withdrawn to live on, the loss of their confirmed Chapter twelve, which would have allowed them to repay their unsecured creditors at [a] much lower interest rate, the diminution of Harriet Greenwood's health and, because of the inability to farm, the loss of actual production history, requiring Plaintiffs to use the lower T-yield." *See* 7 C.F.R. § 400.55(c) ("If no insurable acreage of the insured crop is planted for a year, a production report indicating zero planted acreage will maintain the continuity of production reports for APH record purposes and that calendar year will not be included in the APH yield calculations.").

and that Judge Rendlen determined the amount of the award based on the Norton's farm Actual Production History that Mrs. Burgher allegedly said the Greenwoods could use. Plaintiffs disagree, claiming that the damage award was based upon their actual planting history, the insurance policy and the applicable FCIC procedures, and not the altered documents at issue in this case. Plaintiffs argue that the "Arbitrator determined that Mr. Greenwood was entitled to transfer his son Scott's history from the Flowers farm instead of the much lower transitional yield resulting from RCIS' arbitrary combination of it with the Norton farm when the claim was supposedly corrected." The Court confirmed the arbitration award in its November 9, 2004 Order. In the Order, the Court also found that not all issues had been resolved in arbitration, and that any remaining tort claims were not covered by the arbitration judgment. The Court further granted Plaintiffs' Motion to Amend its Complaint. On February 1, 2005, Plaintiffs filed their Second Amended Complaint alleging (1) fraud; (2) interference with business expectancy and contract; and (3) negligent supervision. Plaintiffs voluntarily dismissed all claims against Mr. Collins on July 7, 2005.

## II.     MOTION FOR SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Crumley v. City of St. Paul*, 324 F.3d 1003, 1006 (8th Cir. 2003). The United States Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 1).

"'By its terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment; the requirement is that there be no *genuine* issue of *material* fact.'" *Hufsmith v. Weaver*, 817 F.2d 455, 460 n.7 (8th Cir. 1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis added by Supreme Court)). Material facts are "those 'that might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 247-48). Summary judgment will be denied due to a material issue of genuine fact if "the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." *Crumley*, 324 F.3d at 1006. Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23, *quoted in St. Jude Med., Inc. v. Lifecare Intern., Inc.*, 250 F.3d 587, 595 (8th Cir. 2001). "The respondent must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 629 (8th Cir. 2005).

In analyzing summary judgment motions, the court must view the evidence in the light most favorable to the non-moving party. *Crumley*, 324 F.3d at 1008. The non-moving party is given the benefit of any inferences that can logically be drawn from those facts. *Matsushita*, 475 U.S. at 586. The court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The court instead "perform[s] only a gatekeeper function of determining

7

whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.*

## III. DISCUSSION

A. **<u>Fraud</u>**

Plaintiffs claim that Sharon Burgher misrepresented that Plaintiffs were entitled to use the prior production history for the Norton farm in calculating the Plaintiffs APH for that unit after Plaintiffs started renting the farm in 2000, even though Plaintiffs had not materially participated in farming that unit prior to renting it in 2000. Plaintiffs further allege that Burgher forged and altered documents relating to their crop insurance from 1999 - 2001. In Missouri,

> [p]laintiffs must prove nine elements to establish fraud: (1) a representation of fact; (2) the falsity of the representation; (3) the materiality of the representation; (4) knowledge by the speaker of the representation's falsity or ignorance by the speaker of its truth or falsity; (5) an intention by the speaker that the representation be acted on by the hearer; (6) the hearer's ignorance of the truth or falsity of the representation; (7) reliance by the hearer on the representation; (8) the right of the hearer to rely on the speaker's truthfulness; and (9) injury to the hearer as a result of the hearer's reliance on the representation.

*Littlefield v. Edmonds*, 172 S.W.3d 903, 906 (Mo. App. 2005); *Trimble v. Pracna*, 167 S.W.3d 706,712 n.5 (Mo. 2005). The Court will also address vicarious liability for the fraud. Defendants argue that Plaintiffs have failed to present a prima facie case of fraud.

*1. Representation of Fact*

Plaintiffs allege that Burgher represented that they could use the production history of the Norton farm in calculating the APH on that farm unit. During their depositions, neither Mr. Greenwood nor Mrs. Greenwood could identify the alleged documents that were forged or altered. Plaintiffs argue that "Plaintiffs are lay-person farmers who cannot reasonably be expected to identify

8

a relatively few documents out of the voluminous record," especially since many documents have no signatures and contain information that varies from the information reported by Plaintiffs. Furthermore, Plaintiffs point to (1) testimony during the arbitration proceeding where the Greenwoods testified regarding Burgher's alleged misrepresentations at arbitration, and (2) answers to discovery requests identifying the documents.[7]

This Court finds that there is sufficient evidence supporting Plaintiffs allegation to create a genuine issue of material fact. Burgher testified during the arbitration proceeding that she knew that Plaintiffs did not farm the Norton prior to 2000. (Pl.'s Ex. W). However, there are documents generated by RCIS that include production history for years prior to the year 2000.[8] (Pl.'s Ex. V).

## 2. Falsity of the Representation

The Court finds that the alleged representation, if made, was false. The regulations promulgated pursuant to the FCIA provide that producers with no APH use T or D-Yields when determining the amount of coverage available. *See* 7 CFR § 400.55(b)(6); FCIC Directive 18010 § 4 ¶ C(12).[9]

## 3. Materiality of the Representation

---

[7]Defendants contend that it was Plaintiffs' lawyers that "identified" the alleged misrepresentations, not Plaintiffs.

[8]The Court notes that the parties also disagree as to whether the 2001 crop loss claim was properly corrected and revised pursuant to the mandates of FCIC procedure.

[9]FCIC Directive 18010 § 4 ¶ C(12), relating to the transfer of APH data, states "[i]f an insured has an approved APH yield and turns the operation or some of the operation, over to another person who has participated (managed, performed the physical activities necessary to produce the crop, or received a share of the crop) in the operation and the establishment of the approved APH yield, the AIP may approve transferring all the years of APH yield history (not including non-actual yields and assigned yields which break continuity of records for this purpose) for the acreage being transferred to the person taking over the operation. The new operator must provide the AIP with verifiable evidence that indicates a transfer of the APH yield history is appropriate.

The alleged misrepresentation was clearly material to Plaintiffs' 2001 claim. Beyond reducing their indemnity,[10] the dispute significantly delayed the claim filed by Plaintiffs in November 2001.[11] Thus, a reasonable fact-finder could find that the representation was material.

*4. Knowledge by the Speaker of the Representation's Falsity or Ignorance by the Speaker of its Truth or Falsity*

As pointed out by Defendants in their Memorandum in Support of their Motion for Summary Judgment, Burgher maintained all necessary licenses and participated in training available for loss adjustors. Giving Plaintiffs the benefit of any inferences that can logically be drawn from these facts, the Court finds that a fact-finder could find that Burgher knew her alleged misrepresentation was in contravention to FCIC regulations. *Matsushita*, 475 U.S. at 586.

*5. An Intention by the Speaker that the Representation be Acted on by the Hearer*

Based on the evidence presented in this case, if Burgher represented that Plaintiffs could use the Norton farm production history to determine the appropriate APH, a reason that she provided the information was that Plaintiffs would gather the necessary records so the APH could be calculated to determine the amount of insurance coverage Plaintiffs would receive in the event they made a claim.

*6 - 8. The Hearer's Ignorance of the Truth or Falsity of the Representation, Reliance by the Hearer on the Representation and the Right of the Hearer to Rely on the Speaker's Truthfulness*

Plaintiffs argue that they are lay-persons and relied on the representation by Burgher.

---

[10] Defendants argue that even if the misrepresentation was made, their indemnity ultimately was not reduced because the Arbitrator's award was based on a yield using the Norton farm history and not the transitional yield established by the FCIC.

[11] *See supra* n.6 for description of the damages claimed by Plaintiffs due to delay.

Defendants argue that knowledge of regulations is imputed to Plaintiffs. *See Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384-85 (1947). In *Merrill*, the Court reasoned that

> [j]ust as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents. Accordingly, the Wheat Crop Insurance Regulations were binding on all who sought to come within the Federal Crop Insurance Act, regardless of actual knowledge of what is in the Regulations or of the hardship resulting from innocent ignorance.

*Id*. Indeed, not only is knowledge of the regulations imputed in this case, the regulations are expressly incorporated by reference in the Standard Reinsurance Agreement.

Defendants argue that Plaintiffs should be deemed to have had knowledge that they could not rely on the Norton farm's production history, regardless of what Burgher may or may not have told them. The regulation on point in this case indicates "[i]f no acceptable production records are available, the approved APH yield is the adjusted T or D-Yield (65 percent of T or D-Yield)." 7 CFR § 400.55(b)(1). However, as Plaintiffs point out, the published regulations do not define what "acceptable production records" are. Instead, it is FCIC Directive 18010 § 4 ¶ C(12) that specifically describes when insureds may transfer APH data. Thus the reasoning in *Merrill* does not apply; this Court will not impute knowledge when there has been no legal notice by publication in the Federal Register or United State Code. *Merrill*, 322 U.S. at 384 (an examination of the regulations published in the Federal Register would have indicated that spring wheat which has been reseeded on winter wheat average was specifically excluded from coverage). Likewise, this Court finds that the SRA in this case incorporates only the published regulations of the FCIA and FCIC and contains no specific reference to when production history may be transferred. Thus, the policy's terms do not constitute knowledge of the unpublished regulations. *See Walpole v. Great Amer. Ins. Cos.*, 914 F. Supp. 1283

11

(D.S.C. 1994) (interpretation of the policy provisions); *Nobles v. Rural Community Ins. Servs.*, 303 F. Supp.2d 1292, 1303 (M.D. Ala. 2004) ("Under. . .federal law, however, Nobles and Hales are charged with notice of the content of their policy as it appears in the Code of Federal Regulations, and therefore cannot maintain claims for suppression of material fact or negligence and wantonness that are based on RCIS failing to inform them of the provisions of that policy").

Furthermore, viewing the facts in a light favorable to Plaintiffs, the published regulations did indicate that RCIS was authorized to calculate the approved APH yields. *See* 7 C.F.R. § 400.52(r)) (RCIS, as a verifier, was "[a] person person authorized by the FCIC to calculate approved APH yields"). Burgher, who had been charged with following the FCIA and its promulgated regulations, was responsible for collecting and forwarding the necessary information to RCIS for verification. *See* 7 C.F.R. § 400.168(a); FCIC Directive 18010 § 5 ¶ A(1) ("agents responsible for "explaining production reporting and supporting record requirements to producers"). There is no evidence that Plaintiffs knew of the falsity of Burgher's alleged misrepresentations. Furthermore, a reasonable fact-finder could find that Plaintiffs reasonably relied on Burgher's representation.

*9. Injury to the Hearer as a Result of the Hearer's Reliance on the Representation*

Defendants argue that Plaintiffs have not sustained any damages because they recovered breach of contract damages, based, in part, on the production history of the Norton farm. Plaintiffs argue that most of the arbitration award was due to correcting the payment yield on the Flowers farm. Plaintiffs are also seeking consequential damages resulting from delay when Burgher allegedly wrongfully manipulated Plaintiffs' units and yields and then RCIS deliberately misconfigured Plaintiffs' units when it corrected their claim in order to avoid FCIC's scrutiny of the policy. *See supra* n. 6 and *infra* Section C. Lost Profit Damages. This Court finds that viewing all reasonable

inferences in favor of Plaintiffs, a reasonable fact-finder could find the nine elements of fraud based on the conduct of Defendants.

*10. Vicarious Liability*

Defendants argue that MCM and RCIS cannot be liable for any fraud of Burgher because Burgher was an agent of Plaintiffs and not an agent for the insurance company. Indeed, "[t]he general rule is that the insurance broker is the agent of the insured. However, whether an insurance broker is the agent of the insurer or of the insured depends on the facts of the particular case." *Electro Battery Mfg. Co. v. Commercial Union Ins. Co.*, 762 F. Supp. 844, 848 (E.D. Mo. 1991) (interpreting Missouri law). "An exception to the presumption occurs in that one who has the authority to take and complete applications for insurance is the agent of the insurer and not of the insured." *Employers Fire Ins. Co. v. Power Model Supply Co.*, 279 F. Supp.2d 1060, 1068 (E.D. Mo. 2003) (internal quotations omitted). Thus, the court must determine whether the facts warrant departing from the general rule. *Electro Battery Mfg.*, 762 F. Supp. at 849. Here, Burgher's actions fall under the aforementioned exception to the general rule. There is evidence that Burgher completed the application documents. She acted as a "verifier" of the information and records presented by Plaintiffs, and she had loss adjustment responsibilities. She took Plaintiffs' documents to RCIS and MCM. Finally, she sold only policies on behalf of RCIS during the relevant time period, and not on behalf of any other companies. Thus, this Court holds that a reasonable fact-finder could find that the facts and circumstances in this case allow a finding that Burgher was not Plaintiffs' agent, and thus, RCIS and MCM may be vicariously liable for the actions of Burgher.

B. **Negligent Training**

One allegation in Count III of Plaintiffs' Second Amended Complaint is that "[i]f Defendant

Rural Community Insurance Services had *properly trained* and supervised its loss adjusters as required by FCIC procedure, it would have known that Sharon Burgher had wrongly manipulated the Greenwood's crop yield history in 1999 and 2000." (emphasis added). In their Motion for Summary Judgment, Defendants argue that "Plaintiffs cannot make a viable claim for negligent training."[12] In response to Defendants' argument, Plaintiffs concede that "Plaintiffs have never alleged that Defendant RCIS did not meet FCIC training requirements for its agents or loss adjusters, or that it did not perform the requisite number of policy audits." Thus, this Court finds that Plaintiffs have withdrawn and abandoned their averment that Defendant RCIS did not properly train its loss adjusters.

C. **Lost Profit Damages**

Plaintiffs are seeking lost profits and other consequential damages stemming from Defendants' alleged fraud. Defendants claim that Plaintiffs have failed to present sufficient evidence to support a finding of lost profits. Specifically, Defendants argue that Plaintiffs' income tax statements show that the farms were never profitable, and that the lost farm income damage calculation is not an accurate picture of Plaintiffs' farming operation. Plaintiffs argue that they have produced many regular business records, beyond just their income tax statements, that relate to lost profits. Additionally, Plaintiffs contend that operating losses in farming were used to offset the earned income of Mr. Greenwood, resulting in a refund of withheld taxes. Also, the bankruptcy court found Plaintiffs' expected yearly profit on the land to be feasible, based on Plaintiffs' Chapter 12 Plan. This

---

[12]The Court notes that Defendants clearly did not address the additional allegations of negligent supervision averred by Plaintiffs in their Second Amended Complaint.

Court finds that there are genuine issues of fact regarding whether Plaintiffs' damages calculation is reasonable. These are precisely the type of factual disputes that preclude a motion for summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [doc. #87] is **DENIED**.

Dated this 22nd day of November, 2005.

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE